IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

FILED

U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 17 2004

JAMES W. McCORMACK, CLERK

DEP CLERK

|  |  |
|---|---|
| THE UNITED STATES OF AMERICA,<br>*ex rel.* NORMAN RILLE and NEAL<br>ROBERTS, | )<br>)<br>) |
| Plaintiff, | ) |
| vs. | ) |
| BOOZ ALLEN HAMILTON INC.,<br>a Delaware Corporation; and ACXIOM<br>CORPORATION, a Delaware<br>Corporation, | )<br>)<br>)<br>) |
| Defendants. | ) |

SEP 17 2004

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

Case No. 4 - 0 4  C V 0 0 0 0 9 8 4 WRW

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3729, *et seq.*

This case assigned to District Judge _Walson_
and to Magistrate Judge _____

**COMPLAINT FOR VIOLATIONS
OF FALSE CLAIMS ACT**

Plaintiff, United States of America, for claims against Defendants, complains and alleges

as follows:

**NATURE OF ACTION**

1.     This is an action brought pursuant to the False Claims Act (31 U.S.C. § 3729, *et

seq.*) through Norman Rille ("Rille") and Neal Roberts ("Roberts") as Relators ("Relator(s)"),

pursuant to 31 U.S.C. § 3730(b), (the "FCA") for and on behalf of the United States of America.

**United States Procurement of Technology, Hardware and Software**

2.     Over the last 10 years, the United States Government, along with its departments

and subdivisions ("the United States Government" or "the Government"), has embarked on a

1

substantial effort to modernize and transform its operations. The United States Government has and does contract with consulting companies, which purport to be skilled in converting and integrating government systems and/or providing information technical services ("Systems Integration Consultants"). Such conversion and implementation requires the Government's procurement of substantial technology hardware, software and technical services from various technology companies ("Technology Vendors"); and, it has required the Government's expenditure of billions of dollars. Indeed, Government spending on information technology services and products constitutes as much as $150 billion annually, or 20 percent of combined commercial and Government information technology sales. Technology Vendors send tens of thousands of proposals to the Government yearly, seeking to capture some of these Government dollars. The Systems Integration Consultants, who are entrusted and retained to act as the Government's independent third party objective advisors, are to assist the Government in determining the most appropriate hardware and software systems and in the integration of the computer systems and networks, all to meet the Government's ever growing needs.

3.     Contracts have been entered into between Systems Integration Consultants and the United States Government pursuant to Anti-Kickback provisions, 41 U.S.C. §51 *et seq.*, Federal Acquisition Regulations ("FARs"), and Truth in Negotiations Act ("TINA") provisions, 10 U.S.C. § 2306 *et seq.* These laws and regulations, the False Claims Act, and the contracts themselves, all prohibit kickbacks and require Systems Integration Consultants and Technology Vendors to be truthful in negotiations, and to certify that the cost or pricing data they proffer to the Government is current, accurate, and complete.

## Systems Integration Consultants and Technology Vendors have Established Alliances to Capture United States Government Dollars

4.      In order to increase market share in Government work, Systems Integration Consultants have established relationships, and routinely use those relationships, with other Systems Integration Consultants and with Technology Vendors, among others, in what have become known as "teams," "strategic alliances," or "alliance teams," ("Alliance(s)" or "Alliance Team(s)" or "Alliance Partner(s)"). The Systems Integration Consultants cooperate nearly exclusively with their Alliance Technology Vendors and other System Integration Consultants to submit proposals, and to consummate sales to the United States Government.

## Systems Integration Consultants and Technology Vendors Have Entered into Conspiracies to Give and Receive Kickbacks and Conceal Them

5.      Plaintiff, the United States Government, alleges that over the last ten (10) years and continuing up to the date of trial (the "Relevant Time Period"), Defendants, Systems Integration Consultants, have exploited the trust the Government has reposed in them to act as independent third party objective advisors, and have destroyed their independence by using their Alliance relationships to enrich themselves through a kickback scheme. More particularly, the Systems Integration Consultants and Technology Vendors have entered into conspiracies between and among themselves wherein they offer and pay such kickbacks between and among themselves in the nature of "referral fees," "influencer fees," "SI Comp fees," "reseller fees," and profits to an entity partially owned by the Systems Integration Consultant, or other benefits ("Kickbacks" or "Kickback Scheme"). Such Kickbacks are given to Systems Integration Consultants for their referral or recommendation to the Government of other Systems Integration Consultants and/or Alliance Technology Vendors, and/or for assisting Alliance Technology

3

Vendors or other Systems Integration Consultants in obtaining contracts or subcontracts with the United States.

6.     These conspiratorial agreements to pay and/or receive such Kickbacks were and are a prerequisite to the inclusion of a Systems Integration Consultant and/or Technology Vendor in an Alliance Team or Alliance Partner relationship with the Systems Integration Consultants. Also, in the furtherance of the Kickback Scheme and conspiracy, many of Defendants, Systems Integration Consultants, created partially or wholly-owned resellers of Technology Vendor products ("Reseller(s)"), which such Systems Integration Consultants used to retain the Kickbacks, and/or used as conduits to funnel the Kickbacks to themselves. The Systems Integration Consultants and Alliance Technology Vendors also have agreed that their Kickback Scheme was and is to be kept confidential. As a result, hundreds of millions of dollars of Kickbacks were sought, received, offered and paid between and among the Systems Integration Consultants and the Alliance Technology Vendors in violation of the False Claims Act and other federal statutes and regulations. In furtherance of this Kickback Scheme and conspiracy, Defendants, and each of them, expressly or impliedly represented or certified to the Government that they complied with various Anti-Kickback statutes, FARs, and TINA when, in fact, they had not, and do not, comply with such laws and regulations. Again, this resulted in the making of false claims in breach of the FCA to the Government in connection with their Systems Integration Consultants and/or Technology Vendor contracts.

## PARTIES, JURISDICTION AND VENUE

7.     Booz Allen Hamilton Inc. ("Booz Allen") is a Delaware corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the

United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Booz Allen and its predecessors and successors were (directly or through subsidiaries, affiliates or assigns), and/or are acting as Systems Integration Consultants for the United States Government.

8.     Acxiom Corporation ("Acxiom") is a Delaware corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Acxiom was and/or is a vendor of hardware and software technology and technical services.

9.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331, 28 U.S.C. § 1345, 31 U.S.C. § 3729 and 31 U.S.C. § 3732(a) inasmuch as the United States of America is a party hereto and the claims set forth herein are founded upon a law of the United States of America.

10.     Venue lies in this District pursuant to 28 U.S.C. § 1391(b), 31 U.S.C. § 3729 and 31 U.S.C. § 3732(a) inasmuch as one or more of the Defendants can be found, resides and/or transacts business within this district of the State of Arkansas; and more specifically, Defendant Acxiom transacts business within this district of the State of Arkansas, and in addition, Defendant Acxiom was and is an Alliance Partner or Alliance Teammate and co-conspirator with Booz Allen in some of the acts alleged herein, which were and caused the making of false claims under the FCA, and also by virtue of violations of the Anti-Kickback statutes, FARs and TINA, and/or that said conspiracy between Defendants Booz Allen and Acxiom was entered into within this district of the State of Arkansas and/or acts pursuant to the conspiracy occurred from within this district of the State of Arkansas, and/or false records/statements/certifications/claims were made or caused to be made from within this district of the State of Arkansas, and/or Defendants

5

performed or are to perform contract work with the Government within this district, and/or were

paid from the Government or to the Defendants within this district of the State of Arkansas.

11.      Relators have previously made a voluntary disclosure of the wrongdoing referred

to herein to the United States Government pursuant to U.S.C. § 3730(e)(4)(B).

**FACTUAL BACKGROUND**

**Defendants' Kickback Scheme**

12.      Plaintiff alleges that during the Relevant Time Period, Booz Allen engaged in the

business of Systems Integration Consulting, and Defendant Technology Vendor, Acxiom, as part

of its businesses, engaged in the business of selling software/hardware and technical services.

All of the Defendants and the Alliance Technology Vendors, including, but not limited to,

virtually all of the major sellers of hardware and software technology in the United States along

with Acxiom, Avanade, Commerce One, Dell Inc. ("Dell,"), EMC Corporation ("EMC"),

Hewlett-Packard Company ("HP"), International Business Machines, Inc. ("IBM"), Informatica

Corporation ("Informatica"), J.D. Edwards & Company ("J.D. Edwards"), Manugistics Group,

Inc. ("Manugistics"), Microsoft Corporation ("Microsoft"), NCR Corporation ("NCR"), Oracle

Corporation ("Oracle"), PeopleSoft, Inc. ("PeopleSoft"), SAP Systems Integration AG ("SAP"),

SeeBeyond, Sun Microsystems, Inc. ("Sun Microsystems"), Unisys Corporation ("Unisys"),

answerFriend, Asera, Inc. ("Asera"), BEA Systems, Inc. ("BEA Systems"), Blue Martini

Software, Inc. ("Blue Martini"), Broadvision, Inc. ("Broadvision"), Cognos, Incorporated

("Cognos"), Jamcracker, Inc. ("Jamcracker"), Kalido Ltd. ("Kalido"), Kana Software, Inc.

("Kana"), Plumtree Software, Inc. ("Plumtree"), Seisint, Inc. ("Seisint"), Teradata, Top Tier

Software, Inc. ("Top Tier") and Vignette Corporation ("Vignette"), and their affiliates,

predecessors, successors in interest, and subsidiaries, entered into contracts with the United

States Government, under the terms of which, and/or by virtue of law or regulation required them

to comply with the False Claims Act, Anti-Kickback statutes, FARs, and TINA.

13.     During the Relevant Time Period, Defendants, their Alliances, and each of them,

in violation of their contracts with the United States Government, established Alliance

relationships between themselves as Systems Integration Consultants and/or Technology

Vendors, wherein Kickbacks were sought, received, offered and paid between and among them

for referring, recommending, and/or assisting the Systems Integration Consultants and their

Alliance Technology Vendors in obtaining contracts and/or subcontracts with the United States

Government.

14.     Defendants had and have actual knowledge that their representations,

negotiations, statements, records, claims, invoices for payment and certification of compliance

(express or implied) with the Anti-Kickback statutes, FARs, and TINA were false, and/or acted

in reckless disregard for their truth, or acted with deliberate ignorance of their falsity.

15.     Defendants, directly or indirectly, submitted false claims for payment to the

United States Government and expressly or impliedly made statements, records and certifications

of compliance in support of such claims, and in violation of the FCA, and also in violation of the

Anti-Kickback statutes, FARs, and TINA.

## RELATOR RILLE'S DIRECT AND INDEPENDENT KNOWLEDGE

16.     Based on the following experiences, communications and documents seen during

his employment at NCR and Accenture, Relator Rille learned that the Alliance Technology

Vendors' relationship with Systems Integration Consultants meant that, as a policy and practice,

Kickbacks were sought, received, offered and paid between the Systems Integration Consultants and their Alliance Technology Vendors. These Kickbacks included "referral fees," "influencer fees," "SI Comp fees," or "reseller fees" in the form of monies, commissions, free or discounted products or other things or services of value. For example, these Kickbacks were and are being paid to Accenture for referring, or recommending, and/or for assisting Alliance Technology Vendors in obtaining contracts or subcontracts with the United States.

17.    Also, Relator Rille learned during his employment with NCR and Accenture that such fees, and the receipt and payment of such fees, which were the subject of the Kickback Practice, were always to be kept confidential, and never to be disclosed to customers. Likewise, Relator Rille learned during his employment with NCR and Accenture that the Alliance relationships of Accenture (which implemented the Kickback Practice) included all the major sellers of hardware and software in the United States along with Avanade, Commerce One, EMC, HP, IBM, Informatica, J.D. Edwards, Manugistics, Microsoft, NCR, Oracle, PeopleSoft, SAP, SeeBeyond, Sun Microsystems, Unisys, answerFriend, Asera, BEA Systems, Blue Martini, Broadvision, Cognos, Jamcracker, Kalido, Kana, Plumtree, Seisint, Teradata, Top Tier and Vignette and their affiliates, predecessors, and successors in interest. Based on the documents received and the statements made to Relator Rille, he has concluded that Alliance relationships meant that all the major Systems Integration Consultants and Technology Vendors were and are engaged in the same Kickback Scheme and associated conspiracies.

18.    In approximately 1991, Norman Rille started working as a Director of Product Support for Teradata Corporation, which was subsequently acquired by NCR. Over the following years he progressed to the position of Senior Product Manager. In approximately

8

1996, Lars Nyberg took over as Chief Executive Officer at NCR, and advised the NCR

personnel, including Relator Rille, that NCR was going to change their marketing strategy to

aggressively "go to market through Alliance Partners," who were Systems Integration

Consultants, and that they were going to create Alliance relationships with all the major Systems

Integration Consultants. Mark Herd, VP of Marketing, and Dale Hazel, Relator Rille's superior,

also repeated those same messages in various group NCR meetings that Relator Norman Rille

attended. As Relator Rille was about to leave NCR for Coopers & Lybrand, John Catozzi, Lead

Architect for Teradata database software at NCR, told Relator Rille that because NCR was

establishing Alliances with all of the major Systems Integration Consultants, including

Accenture, Relator Rille's knowledge of the Teradata products would put him in good stead not

only with Coopers & Lybrand, but also with all the other large Systems Integration Consultants.

When Relator Rille left NCR in 1998, he did not understand at that time that an Alliance

relationship would include the payment of "referral fees," "influencer fees," "SI Comp fees," or

"reseller fees." Such an understanding would later follow.

19.     After employment at Coopers & Lybrand, which became

PricewaterhouseCoopers, Relator Rille began employment in late 2000 at Andersen Consulting

LLP, which soon thereafter became Accenture, as a Senior Manager in the Information Delivery

Architecture group, with special focus on data warehousing and business intelligence

technologies. While working for Accenture, Relator Rille was advised that it was Accenture's

policy and practice to seek and obtain "referral fees," "influencer fees," "SI Comp fees," or

"reseller fees" in the form of monies, commissions, free or discounted products or other things or

services of value for referring, recommending or assisting Accenture's Alliance Technology

Vendors in obtaining contracts or subcontracts with the United States. He learned this when he asked the Alliance Services Manager, Mark Barry, the following: "Mark, can you tell me why these phone contacts are required? Who is it helping?" Mark Barry replied that, among other things, it was to improve the "job economics" for Accenture, thereby affirming the Kickback Scheme. See a copy of Mark Barry's e-mail confirming this which is attached as Exhibit "A."

20.    While working for Accenture, Relator Rille was involved in a job with A.G. Edwards, wherein he learned more about the extent of Accenture's Alliance relationships. He was told by Mark Barry, Alliance Services Manager, and Jeff Gans, Manager of Engagement Economics for Accenture on the A.G. Edwards job, that Accenture's Alliance relationships included virtually all of the major sellers of hardware and software in the United States.

21.    While still at Accenture, Relator Rille received copies of documents, which confirm that Accenture had established Alliance relationships with many of the hardware and software vendors. Relevant portions of some of the Accenture documentation and Technology Vendor documentation on this subject are attached as Exhibit "B." They list as Accenture Alliance partners: Avanade, Cognos, Commerce One, EMC, HP, IBM, Informatica, J.D. Edwards, Microsoft, NCR, Oracle, PeopleSoft, SAP, SeeBeyond, Sun Microsystems, answerFriend, Asera, BEA Systems, Blue Martini, Broadvision, Cognos, Jamcracker, Kalido, Kana, Plumtree, Seisint, Teradata, Top Tier and Vignette.

22.    During his Accenture employment, Relator Rille also received a copy of an Accenture-NCR document entitled "Master Reseller Agreement" between NCR as the vendor and Accenture and Proquire jointly as a Reseller. It also includes a Referral Form and express provisions for payment of referral fees to Accenture by NCR, confirming the existence of both

the Kickback Scheme and its accompanying conspiracies.  The Referral Form provides in

relevant part:

### "Master Reseller Agreement

**THIS MASTER RESELLER AGREEMENT**, effective as of April 13, 2001 (the "Effective Date"), is made and entered into by and between:

**ACCENTURE LLP**, an Illinois limited liability partnership ("Accenture"), and Proquire LLC, a Delaware limited liability company ("Proquire"), each having an office at 100 South Wacker Drive, Chicago, Illinois 60606, (Accenture and Proquire are individually and collectively referred to herein as "Reseller" and "you") and

**NCR Corporation**, a corporation organized and existing under the laws of the State of Maryland, USA, with its principal offices at 1700 South Patterson Blvd., Dayton, Ohio USA ("NCR").

**PURPOSE**
The purpose of this Agreement is to document the understanding between NCR and you with respect to: . . .

• NCR's and your role in referring, selling and delivery of support Service . . . ."

". . . If NCR is the Referred Party and if this Referral Form is accepted by NCR, NCR agrees to pay you the following referral fee in accordance with the Joint Referral Agreement:

_____

If you are the Referred Party and if this Referral Form is accepted by you, you agree to pay NCR the referral fee specified in the Joint Referral Agreement. . . ."

A copy of the most pertinent parts of this documentation is attached as Exhibit "C."

23.     Relator Rille was also sent an e-mail confirming that NCR had paid, for one

calendar year alone, referral fees or reseller fees to Accenture of "around $750,000" in

connection with their Alliance relationship, and for referring Accenture's consulting clients to

NCR for hardware/software sales.  See a copy of said e-mail attached as Exhibit " D."  This e-

mail also outlines the referral/reseller fee arrangements and software discounts available to

NCR's Alliance partners as follows:

| "Reseller Agreement | 20-30% |
| SI Compensation Agreement | up to 8% SI Compensation for new footprints, and, up to 5% for repeat customers |
| Professional Services Subcontracting | Case by case" |

24.    While still working for Accenture, Relator Rille again spoke with Jeff Gans,

Manager of Engagement Economics for Accenture on the A.G. Edwards job, about NCR's

involvement in the A.G. Edwards engagement.  At that time, Jeff Gans identified the Alliance

channel as an important source of enhancement of Accenture's revenues on the A.G. Edwards

engagement.

25.    Kevin Messer, Accenture's Senior Manager in Government Services, the division

that focuses on contracts with the Government, asked Relator Rille to draft a presentation,

describing NCR's Teradata product, and its application in the business intelligence field for

Government projects.  This presentation included a section that outlined the NCR-Accenture

Alliance terms, and was entitled: "Teradata and Accenture: The Business Partnership."  A copy

of relevant portions of this document is attached as Exhibit "E."  Before being confidentially

distributed internally, this document was reviewed and approved by Kevin Messer, and Nancy

Mullen, who was an Accenture Associate Partner and also Accenture's Lead for Capability

Development, among other titles.  A similar document, authored by Accenture personnel,

approved by Nancy Mullen, and received by Relator Rille, is entitled "NCR Teradata-Accenture

Alliance Credentials Deck 12/5/2001." Key and relevant portions of this document are attached as Exhibit "F" and include in part as follows:

> " . . . **NCR & Accenture - Agreement Points**
>
> - **Resale Discounts:**
>   - 20-30% on licenses from list price
> - **Service Integrator Compensation (SI Comp):**
>   - **Up to 8% SI Comp (Systems Integrator Compensation)** for new footprints and up to 5% for repeat customers . . ."

26.     On approximately March 27, 2001, while still employed at Accenture, Relator Rille received a document from NCR entitled "Partner Update," which is attached as Exhibit "G." This document identifies some of the NCR partners, known as "Team Teradata Members" as follows: Accenture, Cap Gemini Ernst & Young ("CGE&Y"), Deloitte, EDS, Hitachi, and iMC, among others.

27.     Additionally, while at Accenture, Relator Rille received a document from SeeBeyond, which was owned in part by Accenture, describing Accenture's Alliance relationship with SeeBeyond. This SeeBeyond document, which is attached in part as Exhibit "H," confirms that Accenture seeks and receives, and SeeBeyond, pays, "referral fees," "reseller fees," provides discounted or free training, software and installation to its Alliance Partners. This document also specifies the terms of the Kickback Scheme with Accenture as follows:

> ". . .   **Our Business Relationship**
>
> - **Equity Position – 3%**
>
> - **SeeBeyond Board Seat – Jack Wilson, Accenture Partner**

- **Strategic eAl Alliance**

- **Incentive Program**

  - Up to 15% paid to engagement ream where SeeBeyond is part of the

  solution

- **Global Marketing Agreement**

  - Referral Agreement – 10%

  - Reseller Agreement – 20%

  - Discounted Training FY '01 for e*Gate; Free for e*Xchange

  - Accenture Trained 300 in 2000.  Plan for 2001 is 600.

- **Solution Center Enablement**

  - Free software and installation . . ."

This SeeBeyond document also identifies other companies likely involved in the Kickback

Scheme and associated conspiracies including, but not limited to, Accenture, Booz-Allen

Hamilton, Calico, Cap Gemini Ernst & Young, Clarify, Computer Sciences Corporation,

Control, DataChannel, EDS, Firepond, i2 Technologies, NetVendor, Oracle, PeopleSoft, Perot

Systems, PricewaterhouseCoopers, Propelis, Remedy Corporation, SAP, SeeBeyond, Sequoia

Software, Siebel, Swift Ready Gold Middleware, Vignette, and Wavbond.

28.     Relator Rille learned that Accenture has been including such Alliance

Technology Vendors in contracts with the United States Government through various

communications and documents he received while at Accenture.  For example:

- Exhibit "H," numbered page 8 identifies the federal Defense Logistics Agency ("DLA") and federal State Department as joint clients of Accenture and SeeBeyond.

- Exhibit "I," entitled "Response for: United States Transportation Command (USTRANSCOM)" dated July 18, 2001, page 5, represents that Accenture has "15 subcontractors and 3 Alliance partners integrated into a cross-functional team" for this Government project.

- The second to the last page of Exhibit "D," identified above is an e-mail from Viney K. Kaushal, Accenture Global Alliance Manager, regarding the "significant activities with regard to the NCR Teradata Alliance relationship" with Accenture.   It identifies "CURRENT & RECENT CLIENTS ENGAGEMENTS (Joint Wins)" for the Accenture NCR Alliance, expressly references federal Government contracts for "US Postal Service, Air Force Test & Development, NAVAIR, FAA, US Air Force EDW (Just Revived) and  US Air Force First."

- The last page of Exhibit "D" states that the amount of the Accenture Resale/SI Comp Revenue [Kickback] from NCR on the US Postal Service contract is To Be Decided; "TBD (Recently Awarded)."  Other entries on this same page confirm that approximately $1.2 million was received by Accenture as Resale/SI Compensation Revenue [Kickback] during the year 2000-2001.

15

- Exhibit "J" is an Accenture document summarizing the involvement of Accenture and its Alliances Team on the business systems modernization engagement for the federal Government's Defense Logistics Agency. Among others, the document identifies Alliance companies as follows: "SAP, Manugistics, and Unisys." Additionally, Exhibit "I" describes the subcontractors and Technology Vendors as part of Accenture's "cross-functional team."

- Exhibit "K," attached and entitled "Oracle S/W Pricing for GTN21" is an Accenture internal worksheet prepared in support of Accenture's proposal for work on the federal project entitled Global Transportation Network for the 21st Century. Significantly, it shows a deeper discount from Oracle to Accenture than to the federal Government on this federal contract.

## RELATOR ROBERT'S DIRECT AND INDIRECT KNOWLEDGE
## OF THE KICKBACK SCHEME

29.     Relator Roberts, a prior partner with Deloitte, and Coopers & Lybrand, which became PricewaterhouseCoopers, has investigated the conduct of Systems Integration Consultants and Technology Vendors. As part of his investigation, he has spoken to various retired and current partners of Systems Integration Consultants, also including partners with his prior firms. In the process, he learned that the Alliance relationships between Systems Integration Consultants and Technology Vendors meant that it is an industry-wide practice for all of the Systems Integration Consultants to seek and receive, and for the Alliance Technology Vendors to

pay, Kickbacks to the Systems Integration Consultants as part of the Kickback Scheme and conspiracy alleged herein.

30.     He learned that these Kickbacks were "referral fees," "influencer fees," "SI Comp fees," or "reseller fees" in the form of monies, commissions, free or discounted products or other things or services of value that were and are being paid to the Systems Integration Consultants for referring, or recommending, and/or assisting such Technology Vendors in obtaining contracts and/or subcontracts with the United States Government.

31.     Relator Roberts further learned that it was the policy and practice of Systems Integration Consultants and Alliance Technology Vendors not to disclose the Kickbacks to their customers.

## SUMMARY OF FALSE CLAIMS ACT VIOLATIONS

32.     During the Relevant Time Period and as described hereinabove, Defendants Booz Allen and Acxiom engaged in and continue to engage in the following systemic wrongful conduct in violation of the FCA:

        a.     Presenting, or causing to be presented, false claims for payment to the United States Government for consulting services pursuant to United States Government contracts, which involved referring, recommending, and/or the assisting of any of the Alliance Technology Vendors and/or other Systems Integration Consultants in obtaining contracts and/or subcontracts with the United States Government and/or seeking and receiving Kickbacks pursuant to the conspiracies and Kickback Scheme as alleged herein.

b.    Making, using, or causing to be made, or causing to be used, false records

and/or statements to the United States Government to obtain Systems

Integration Consulting contracts and/or for support of claims for payment,

and/or indicating that Booz Allen had not sought nor received from any

Booz Allen Alliance Technology Vendors or other Systems Integration

Consultants Kickbacks for referring, recommending, and/or assisting such

Technology Vendors and/or Systems Integration Consultants in obtaining

contracts and/or subcontracts with the United States Government.

c.    Presenting, or causing to be presented, claims for payment to the United

States Government for Acxiom vendor contracts and/or subcontracts with

the United States Government, which involved the referring,

recommending, and/or assisting of Acxiom by any Systems Integration

Consultant in obtaining contracts and/or subcontracts with the United

States Government and/or offering and paying Kickbacks pursuant to the

conspiracies and Kickback Scheme as alleged herein to any such Systems

Integration Consultants.

d.    Making, using, or causing to be made or used, false records and/or

statements to the United States Government to obtain Technology Vendor

or technical services contracts and/or support of claims for payments

and/or indicating that Defendant Technology Vendor Acxiom has not

offered nor paid to Systems Integration Consultants, Kickbacks for

referring, recommending, and/or assisting Technology Vendor Acxiom in

18

obtaining contracts and/or subcontracts with the United States Government.

e.   Presenting, certifying (expressly or impliedly) claims for payment and/or making, using, or causing to be made or used, false records and/or statements to the Government supporting claims for payment to the United States Government under the consulting contracts and/or vendor contracts provided in a manner that violates the Federal Anti-Kickback Statute, 41 U.S.C. §51 *et seq.*, Federal Acquisition Regulations, and TINA, 10 U.S.C. § 2306 *et seq.*

f.   Defendant Booz Allen, and its predecessors, successors, affiliates, and subsidiaries entering into a conspiracy to defraud the Government by getting contracts/subcontracts awarded to them and/or any other Systems Integration Consultants and/or any other Technology Vendors and/or to get false or fraudulent claims allowed or paid, all in a manner that violates 31 U.S.C. §3729(a)(3).

g.   Defendant Acxiom, and its predecessors, successors, affiliates, and subsidiaries, as Technology Vendors entering into a conspiracy to defraud the Government to get contracts/subcontracts awarded to themselves and/or any other Technology Vendors and/or any other Systems Integration Consultants and/or to get false or fraudulent claims allowed or paid, all in a manner that violates 31 U.S.C. §3729(a)(3).

33.     It is alleged that the foregoing practices have resulted in the United States Government, either directly or indirectly through its agencies or intermediaries, purchasing the wrong Technology Vendor products and/or technical services, and/or paying out monies or excess monies to Defendants, to which Defendants are not entitled, all in violation of the FCA.

34.     It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Defendants had it known that the consulting services, technical services, and/or the software and/or hardware sales for which the contracts were proposed were subject to a scheme to violate the Federal Anti-Kickback Act of 1986, §§ 1-8, as amended, 41 U.S.C.A., §§ 51-58, and/or Federal Acquisition Regulations, and/or TINA, 10 U.S.C. § 2306 *et seq.*

35.     It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have honored Defendants' claims for payment, had it known that the consulting services, technical services, and/or the software and/or hardware sales for which the claims were made, were provided in a manner that violates the Federal Anti-Kickback Act of 1986, §§ 1-8, as amended, 41 U.S.C.A., §§ 51-58, Federal Acquisition Regulations, TINA, 10 U.S.C. § 2306 et seq.

## COUNT ONE

## SUBSTANTIVE VIOLATIONS OF THE FALSE CLAIMS ACT

36.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 35 above, as if fully set forth herein.

37.     Accordingly, Defendants have violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a) by:

a.    Knowingly presenting or causing to be presented to the United States Government, directly or indirectly, false or fraudulent claims to be paid or approved, directly or indirectly, by the United States Government (31 U.S.C. § 3729(a)(1));

b.    Knowingly making, using, or causing to be made or used, misrepresents false records or statements and/or false certifications to obtain contracts/subcontracts and/or the payment of false or fraudulent claims to be paid or approved by the United States Government (31 U.S.C. § 3729(a)(2));

38.    The United States Government, upon presentation of such claims for payment, whether directly or indirectly, remitted payment despite the false nature of such claims.

39.    Pursuant to 31 U.S.C. § 3729(a), Defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by Defendants.

40.    The United States Government has further sustained damages, and will yet sustain damages up to the date of trial in an amount yet to be determined.  Pursuant to 31 U.S.C. § 3729(a) Defendants are liable for three times the amount of all such damages sustained by the United States Government.

## COUNT TWO

## FALSE CLAIMS ACT CONSPIRACY

41.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40 above, as if fully set forth herein.

21

42.     Pursuant to 31 U.S.C. § 3729(a)(3) through the acts described above and

otherwise, Defendants entered into a conspiracy or conspiracies among themselves and with

others to defraud the United States to obtain the above-alleged contracts and/or subcontracts and

to get false and fraudulent claims allowed or paid.  Defendants have also conspired to omit

disclosing or to actively conceal the Kickback Scheme which, if known, would have reduced

Government obligations to them or resulted in repayments from them to Government programs.

Defendants have taken substantial steps in furtherance of those conspiracies, by, among other

things, preparing false records, by submitting such records to the Government for payment or

approval, and by directing their agents, consultants, and personnel not to disclose and/or to

conceal Defendants' fraudulent practices.

43.     The United States Government, through its intermediaries, is unaware of

Defendants' conspiracies or the falsity of the records, statements and claims made by

Defendants, and their agents, employees and co-conspirators, and as a result thereof, have paid

and continue to pay millions of dollars to Defendants that they would not otherwise have paid.

44.     By reason of Defendants' conspiracies and the acts taken in furtherance thereof,

the United States Government, and its intermediaries, have been damaged in the amount of many

millions of dollars.

## PRAYER

WHEREFORE, Plaintiff, United States Government, prays for judgment against

Defendants for:

45.     A judgment against all Defendants for all losses and damages that have been, or

will be, sustained by the United States Government during the Relevant Time Period as a result

of their violations of the FCA, as alleged herein, and triple the amount of such damages and for

forfeiture of all revenues paid by the United States Government to Defendants under the

contracts acquired in violation of the FCA pursuant to 31 U.S.C. § 3729; and civil penalties of

not less than $5,500, nor more than $11,000, for each and every such violation;

46.   Declaratory judgment that the herein-described false claims, false records and

statements and conspiracy by and among the Defendants are in violation of the FCA;

47.   An injunction against all Defendants that they not engage in further false claims,

use of false records and statements and conspiracy with respect to consulting and

software/hardware services/products as described herein;

48.   Reasonable attorney's fees;

49.   Costs incurred in the prosecution hereof; and

50.   Such other relief as the Court deems just and equitable.

Attorneys for Relators/Plaintiff

WILSON, ENGSTROM, CORUM & COULTER
200 South Commerce, Suite 600
Post Office Box 71
Little Rock, AR 72203
Telephone: (501) 375-6453
Facsimile: (501) 375-5914

Dated: _9-17-04_

By: _____
Stephen Engstrom

Von G. Packard (CA74877)
Jacquetta Bardacos (CA139211)
PACKARD, PACKARD & JOHNSON
Four Main Street, Suite 200
Los Altos, California 94022
Telephone:  (650) 947-7300
Facsimile:  (650) 947-7301

Craig H. Johnson (CA90539)
PACKARD, PACKARD & JOHNSON
2795 Cottonwood Parkway, Suite 600
Salt Lake City, Utah 84121
Telephone:  (801) 428-9000
Facsimile:  (801) 428-9090

23